## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HAWAI'I ORCHID GROWERS   :
ASSOCIATION,      :
           :
   Plaintiff,    :
           :
 v.        : Civil Action No. 04-0914 (JR)
           :
U.S. DEPARTMENT OF AGRICULTURE, :
           :
   Defendant.    :

### MEMORANDUM

    Plaintiff, an organization representing orchid growers in Hawaii, challenges a new rule removing restrictions on the importation of phaleonopsis orchids from Taiwan in approved growing media.  Cross-motions for summary judgment are presented. The government's motion will be granted because, for the reasons discussed below, I cannot find the rule to be arbitrary, capricious, or unlawful, and because I have no jurisdiction to consider plaintiff's Endangered Species Act claims.[1]

### Background

    The Animal and Plant Health Inspection Service (APHIS) is an entity within the Department of Agriculture.  Acting

---

[1] A motion for preliminary injunction is technically outstanding, but the parties have combined the issue of preliminary injunction with proceedings for summary judgment. See Consent Mot. for Extension of Time to File Resp./Reply as to Mot. for Prelim. Inj. And to Set a Briefing Schedule for Dispositive Mots. (6/14/04).  Imports under new rule were actually scheduled to begin in January of 2005. 1/6/05 Tr. at 52.  Based on my ruling today, the motion for preliminary injunction is now moot.

pursuant to the Plant Protection Act of 2000, APHIS promulgates the "Quarantine 37" regulations, 7 C.F.R. § 319.37, to protect the nation's plant resources from foreign pests.  Among those plant resources are orchids, which are grown mostly in Hawaii, Florida, and California.

Most potted orchids in the U.S. belong to the phaleonopsis (moth orchid) genus.  Phaleonopsis orchids are epiphytic (capable of growing without deriving nutrients from soil).  Taiwan is the world's largest grower of phaleonopsis orchids.  Until recently, Quarantine 37 restricted the importation of phaleonopsis to plants with bare roots (or those established on tree fern slabs, coconut husks, or coconut fiber).  Such plants were then further "grown out" in U.S. nurseries before they were sold at the retail level.  The Quarantine 37 restrictions made them easier to inspect for pests but also tended to limit the size and maturity of imports.  Moreover, unlike potted orchids, bare-rooted plants cannot survive long shipping delays, so they must be shipped by air instead of sea, adding dramatically to the cost of importation.

On May 5, 2004, APHIS amended the Quarantine 37 rules to allow the importation of potted phaleonopsis orchids from Taiwan (only Taiwan) in approved growing media.  69 Fed. Reg. 24,916 (codified at 7 C.F.R. § 319.37-8(e)).  The new rule adds Taiwanese phaleonopsis orchids to the list of plants covered by

the plants-in-growing-media rule, 7 C.F.R. § 319.37-8(e), which allows for imports with a number of restrictions, including these:

a. Plants may be imported in fresh approved growing media only, which include, _inter alia_, sphagnum moss (apparently the most commonly used medium), coal cinder, cork, glass wool, organic and inorganic fibers, peat, plastic particles, polyethylene, polymer stabilized starch, polystyrene, vermiculite, and volcanic rock.

b. There must be agreements between APHIS and foreign plant services, and between foreign plant services and growers, providing for local inspections and enforcement of the plants-in-growing-media restrictions.

c. Plants must be grown in clean, pest-free greenhouses with a number of requirements for screens, storage, packaging, clean water, bench heights, automatic doors, disinfection, and other protective phytosanitary measures.

d. There are a number of restrictions on seeds and parent plants that can be used to produce new plants.

e. Plants must be grown for at least four months in rule-compliant greenhouses, and they must be inspected no more than 30 days before export.

During the first year of implementation of the new rule, APHIS plans to inspect a minimum of 50 percent of imports

- 3 -

(as compared to 2 percent of imports under established
importation programs, A.R. at 523), and APHIS has flexibility to
deal with new problems should they arise by stopping imports or
shutting down the entire import program.  69 Fed. Reg. 24,927;
1/6/05 Tr. at 44-45.

The new rule is the product of a long history in which
plaintiff has actively participated.  The Taiwanese government
requested a rule change in 1994.  APHIS performed a risk
assessment and proposed that the rule be changed to allow for
phaleonopsis imports in approved growing media from all
countries.  63 Fed. Reg. 46,403 (Sept. 1, 1998).  After receiving
comments, APHIS modified the proposed rule to allow for imports
only from Taiwan.  APHIS then consulted with the Fish and
Wildlife Service, acting pursuant to the Endangered Species Act.
On April 7, 2003, FWS concluded that the proposed new rule would
not adversely affect federally listed or proposed endangered
species or their habitats.  A.R. at 299.  On December 18, 2003,
acting pursuant to the National Environmental Policy Act, APHIS
published an environmental assessment and a finding of no
significant impact.  A.R. at 414.  On May 6, 2003, APHIS
published an updated and expanded risk assessment, A.R. at 1707;
and it prepared both a required economic analysis, A.R. at 1506
(suggesting possible negative impact on domestic orchid
producers), and a required civil rights impact analysis, see A.R.

at 1519 (finding no adverse civil rights impact, but not analyzing possible disparate economic impact).

Plaintiff represents Hawaiian orchid growers who, all parties agree, will be economically impacted by increased competition from Taiwanese orchid growers.  That issue is not before me, however.[2]  The question presented is whether the new rule lacks a rational basis and whether its issuance violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., the Plant Protection Act of 2000 (PPA), 7 U.S.C. § 7701 et seq., or the Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq.

## Analysis

### Plaintiff's Endangered Species Act (ESA) claim

Plaintiff claims that APHIS violated the ESA in determining that the new rule would not adversely affect listed, proposed, or threatened species.  The ESA provision for citizen suits, 16 U.S.C. § 1540(g)(1)(A), would apply to plaintiff's claims here, except that, under the ESA, plaintiff was required to provide 60 days notice of intent to sue, 16 U.S.C. § 1540(g)(2)(A)(I), and it failed to do so.  Plaintiff thus attempts to invoke the ESA through the APA.  The APA may only be used as a vehicle to challenge government action, however, when

---

[2] Another issue not before me is the possible preemptive effect of the new regulation on inspections by the State of Hawaii.  1/6/05 Tr. at 16, 23-28.

"there is no other adequate remedy in a court."  5 U.S.C. § 704;

Bennett v. Spear, 520 U.S. 154, 161-62 (1997).  The cases on

which plaintiff relies, including Bennett, 520 U.S. at 174-77,

and Maine v. Norton, 257 F. Supp. 2d 357, 376 (D. Me. 2003), are

inapposite.  In those cases, the agency being sued was the one

charged with ESA implementation.  In Bennett, the Court found

that the APA was an appropriate vehicle only for claims that

could not be recognized under the ESA's citizen suit provision,

Id. at 171-77.  This is not such a claim.[3]

Because a failure to provide 60 days notice under the

ESA is jurisdictional, plaintiff's ESA claim must be dismissed

for lack of jurisdiction.  See Southwest Ctr. for Biological

Diversity v. United States Bureau of Reclamation, 143 F.3d 515,

520 (9th Cir. 1998); Bldg. Indus. Ass'n of S. Cal. v. Lujan, 785

F.Supp. 1020 (D.D.C. 1992); 1/6/05 Tr. at 52-53.

**Plaintiff's Standing**

Defendant argues that plaintiff lacks standing to bring

its claim.  Although better pleadings by plaintiff on this issue

might have avoided the need for the extensive discussion below,

this argument does not withstand scrutiny.

---

[3] My recent decision in Common Sense Salmon Recovery v.
Evans, 329 F.Supp.2d 96 (D.D.C. 2004), discussed in the briefs,
did not address this issue, nor did Judge Kollar-Kotelly's
decision in Haw. Longline Ass'n. v. Nat'l Marine Fisheries Serv.,
281 F.Supp.2d 1, 23-27 (D.D.C. 2003) (a complex case in which the
same agency was both implementing the ESA and regulated under the
ESA).

Plaintiff represents "breeders, propagators, and growers of orchids in Hawai'i," and at least one of its members grows potted phaleonopsis orchids. Second Am. Compl. at 4. Where plaintiff is an organization serving as a representative of its members, the requirement for standing is that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." Sierra Club v. EPA, 292 F.3d 895, 898 (D.C. Cir. 2000). Except in a footnote regarding plaintiff's NEPA claims, addressed below, defendant challenges only the standing of plaintiff's members, and not the appropriateness of plaintiff as a representative party.

Article III standing doctrine requires that plaintiff show: "(1) injury-in-fact, (2) causation, and (3) redressability." Fund for Animals v. Norton, 322 F.3d 728, 732 (D.C. Cir. 2003); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61. Additionally, when challenging agency action, plaintiff must show that the injuries suffered fall under the "zone of interests" that the relevant statutes were designed to protect. See Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 394-400 (1987).

To demonstrate the elements of standing at the summary judgment stage, plaintiff may not "rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." Lujan, 504 U.S. at 561. "In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it." Sierra Club, 292 F.3d at 899-900. This is one of the cases where standing is not self-evident. Plaintiff is not the direct subject of government regulation. Causation and redressability depend on the unpredictable response of the regulated party to new regulations. While standing is "'substantially more difficult'" to establish, Lujan, 504 U.S. at 562 (citation omitted), I find that plaintiff has made the requisite showing and note, before proceeding further, that defendant's own economic analysis predicts an increase in export activity under the new rule. See A.R. at 1510-1517.

## 1. Injury-in-fact

To show an injury-in-fact, plaintiff must allege an injury that is "concrete and particularized . . . [and] 'actual or imminent, not 'conjectural' or 'hypothetical.'" Lujan, 504 U.S. at 560 (citations omitted).

For its PPA claim, plaintiff alleges that pests will come into the U.S. on potted phaleonopsis that will be imported under the new regulation.  E.g., Second Am. Compl. ¶¶ 29,34. Plaintiff alleges further that its members will incur great expense to protect their plants from these pests and to attempt to eradicate any of these pests that do infest their plants. Pl.'s Reply at 5; 1/6/05 Tr. at 8-9.  This need for protection is of specific concern because infested plants may not be shipped to the mainland.  1/6/05 Tr. at 8-9.

Defendant responds that it is speculative to argue that these pests will even enter the U.S., or that, if they do, they will cause injury to plaintiff's members.  Def.'s Reply at 8-10. The first point appears to be "an effort to bootstrap standing analysis to issues that are controverted on the merits. . . . [and] falls into the familiar trap of confusing the merits of a case with the threshold requirement of standing to present a challenge."  Public Citizen v. FTC, 869 F.2d 1541, 1549 (D.C. Cir. 1989).  There are hundreds of pages of pleadings and a 1,743 page administrative record in this case, a primary focus of which is the question of whether these pests will get into the U.S. Plaintiff's concerns cannot be dismissed as "speculative."

The second point -- that it is speculative to argue that introduced pests will cause injury specifically to plaintiff -- is also unavailing.  Even if plaintiff's claim is

not "self-evident," <u>Sierra Club</u>, 292 F.3d at 900, the record contains the declaration of Professor Arnold Hara, an expert on pest management for the orchid industry in Hawaii.  Dr. Hara states that pests will be introduced into Hawaii and will cause "growers of potted epiphytic orchids in Hawaii" great expense in pest management.  Decl. of Arnold Hara, May 28, 2004 at ¶ 6. Defendant focuses on the fact that Dr. Hara does not specifically identify <u>plaintiff's members</u> as being affected, P.'s Reply 8-9; 1/6/05 Tr. at 29, but plaintiff represents at least one "grower[] of potted [phaleonopsis] orchids" in Hawaii, Second Am. Compl. at 4.

        For its NEPA claim, plaintiff alleges that blood-sucking midges will come into the U.S. with potted phaleonopsis orchids and cause itching, welts, and lesions amongst the population of Hawaii.  Second Am. Compl. ¶¶ 39-40.  Defendant argues that, as with the PPA claim, plaintiff has shown no direct harm to its members, and that plaintiff's organizational purpose does not include protecting tourists, beach-goers, or even "those lightly clothed folk who work about greenhouses cultivating orchids," P.'s Reply 3. <u>E.g.</u>, D.'s Reply 4-5.  It is true that plaintiff did not initially tie the threat of midges directly to its members or to its organizational purpose, but plaintiff's reply makes it clear that plaintiff's workers will, like others in Hawaii if plaintiff's allegations are correct, suffer from

irritating midge bites.  P.'s Reply 2-3.  Plaintiff "promotes
coordinated efforts among breeders, propagators, and growers of
orchids in Hawai'i and supports marketing, research, and
educational projects."  Second Am. Compl. at 4.  Despite
defendant's protestations, P.'s Reply 5 n.3, this description can
be fairly read (at least for standing purposes) to include
protecting the comfort, health and/or effectiveness of its
members' workforce.

   <u>2. Causation and Redressability</u>

   For its PPA claim, plaintiff alleges that pests will
enter the U.S. under the new rule that would not enter under the
old rule.  Promulgating the new rule is the obvious cause of this
change, and causation is thus self-evident.  Redressability is
equally self-evident.

   NEPA requires that agencies prepare an environmental
impact statement (EIS) for "major Federal actions significantly
affecting the quality of the human environment."  42 U.S.C.
§ 4332(2)(C).  There is a two-step process to determine if an
action has a "significant" impact.  The agency initially performs
an environmental assessment.  40 C.F.R. § 1501.4.  That
assessment will lead to a decision to either prepare a finding of
no significant impact (FONSI), or to prepare a full EIS.  <u>Id.</u>
Here, the process stopped at the issuance of a FONSI.  Defendant
argues that there is no showing that its rule would have been

different even if defendant had performed an EIS instead of
issuing a FONSI.  Def.'s Mot. for Summ. J. at 25.  It is true
that "to demonstrate standing . . . a procedural-rights plaintiff
must show not only that the defendant's acts omitted some
procedural requirement, but also that it is substantially
probable that the procedural breach will cause the essential
injury to the plaintiff's own interest."  Florida Audubon Soc. v.
Bentsen, 94 F.3d 658, 664-65 (D.C. Cir. 1996) (en banc).
Plaintiff in the instant case has not separated the failure to
perform an EIS from the likely results of the EIS.  Fairly read,
however, plaintiff's arguments (including pleadings and
supporting evidence) allege not only that APHIS should have
performed an EIS, but that an accurate EIS would have led to
changes in the proposed rule because the proposed rule would lead
to serious environmental damage.  See, e.g., Second Am. Compl.
¶¶ 39-40; P.'s Reply 2-4.  Thus, causation is sufficiently
alleged for standing purposes.  Similarly, under plaintiff's
version of the facts, changes in the rule as a result of a proper
EIS would redress plaintiff's injuries.

>        3. Zone of Interests

>        Plaintiff's claims of injury fall within the zones of
protected interests.  First, in the PPA, Congress found that,
"the detection, control, eradication, suppression, prevention, or
retardation of the spread of plant pests or noxious weeds is

necessary for the protection of the agriculture, environment, and economy of the United States."  7 U.S.C. § 7701(1).  Harm to these interests is precisely what plaintiff is alleging.  Second, NEPA was written to, <u>inter alia</u>, "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."  42 U.S.C. § 4321.  Protecting the health and welfare of Hawaiian workers by preventing the import of blood-sucking midges falls within this statutory purpose.

**<u>Legal Standard</u>**

Petitioners seeking judicial review of agency decisions under the APA must demonstrate that the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  <u>Citizens to Preserve Overton Park, Inv. v. Volpe</u>, 401 U.S. 402, 416 (1971).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  <u>Motor Vehicle Mfr.s Ass'n of the United States,</u>

Inc., v. State Farm Mut. Auto. Ins. Co. 463 U.S. 29, 43 (1983)
(citation omitted).  With respect to scientific questions
entrusted to agency expertise, like the questions presented here,
agency decisions are entitled to "great deference."  West
Virginia v. EPA, 362 F.3d 861, 867 (D.C. Cir. 2004) (citation
omitted).  "When specialists express conflicting views, an agency
must have discretion to rely on the reasonable opinions of its
own qualified experts even if, as an original matter, a court
might find contrary views more persuasive." Marsh v. Or. Natural
Res. Council, 490 U.S. 360, 378 (1989); See Wis. Power & Light
Co. v. FERC, 363 F.3d 453, 464 (D.C. Cir. 2004).

        In this case, my review is "confined to the full
administrative record before the agency at the time the decision
was made." Environmental Defense Fund, Inc. v. Costle, 657 F.2d
275, 284 (D.C. Cir. 1981).  My determination as to the legality
of defendant's actions is one of law, not fact.  See American
Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083-84 (D.C. Cir.
2001).

**Plaintiff's rational basis and sound science claims**

        The PPA gives the Department of Agriculture broad
powers to restrict plant entry as "necessary to prevent the
introduction [of plant pests] into the United States."  7 U.S.C.
7712(a).  Congress anticipated a balanced approach to this
mission, instructing the Department of Agriculture to "facilitate

exports, imports, and interstate commerce in agricultural
products and other commodities that pose a risk of harboring
plant pests or noxious weeds in ways that will reduce, to the
extent practicable, as determined by the Secretary, the risk of
dissemination of plant pests or noxious weeds."  7 U.S.C.
§ 7701(3).  Regulations under the PPA must be "based on sound
science."  7 U.S.C. § 7712(b).

     In May 2003, APHIS updated its risk assessment of the
new regulation and determined that under the new rule the pest
risk "will be the same level or below that posed by the currently
permitted bare root importations."[4]  Administrative Record (A.R.)
1708.  This risk assessment is modeled on methodology provided by
the United Nations' Food and Agriculture Organization.  A.R. at
1710; see generally A.R. at 1315-45 (APHIS Guidelines for
Pathway-Initiated Pest Risk Assessments).  First, APHIS created a
master list of all pests that might be associated with
phaleonopsis orchids in Taiwan.  This process yielded 62
potential pests of concern.  See A.R. at 1712-1717.  Then, APHIS

---

[4] This was the finding explicitly required by the Quarantine
37 Regulations at the time.  See 7 C.F.R. 319.37-8(g)(4)(ii)
(2003).  The current regulation simply states that APHIS "will
conduct a pest risk assessment based on pest risk analysis
guidelines established by the International Plant Protection
Convention of the United Nations' Food and Agriculture
Organization."  7 C.F.R. 319-37(g).

winnowed the list to pests that a) are of economic significance[5]; b) are not already present in the U.S.[6]; and c) would actually be likely to follow phaleonopsis orchids in approved growing media into the U.S. with no further pest mitigation measures.  See A.R. at 1320, 1717-18.  This process yielded six pests of concern -- two arthropods, one mollusk, and three fungi.  A.R. at 1719. Next, APHIS analyzed the likelihood and consequences of the introduction of these pests and found them all to pose medium or high risk without mitigation measures.  A.R. at 1719-26.  APHIS then looked at mitigation measures under the plants-in-growing-media rule, and determined that they would effectively preclude introduction of the six pests.  A.R. at 1727-36.

Plaintiff claims that APHIS's risk analysis as described above lacks a rational basis and that it does not follow "sound science" as required by the PPA.  These claims fall into several categories, discussed below.

## 1. Pest list winnowing

Plaintiff asserts that APHIS's initial winnowing from 62 pests to 6 pests was irrational and not based on sound science.  APHIS gathered its data from inspections of

---

[5] This term of art means that there is evidence associating the pest with the plant being assessed.  By definition, all initial pests of concern meet this criterion.  A.R. at 1319.

[6] Or are not widely distributed and are officially controlled.  A.R. at 1319.  Criteria a) and b) together make up the two components of a "quarantine pest."  Id.

phaleonopsis imports under the prior rule, from a literature search, and from other available data.  Def.'s Mot. for Summ. J. at 35.  It removed pests from the list if: 1) the pest itself could not be classified to the species level (the majority of the winnowing); 2) the pest was already present in the U.S. (a large number of additional removals); or 3) there was no specific link between the pest and phaleonopsis orchids, as compared to orchids in general (several removals).  See A.R. at 1717-19.

### A. Quality of data linking pests to orchids

Much of the winnowing was attributable to an absence of data classifying pests at the species level and/or connecting specific pests to phaleonopsis (as compared to orchids in general).  Plaintiff complains about APHIS's reliance on literature searches in this area[7], asserting that literature on phaleonopsis pests is limited, that searches can be hard to execute (since pests often have different names), and that many searches only cover article titles.  APHIS dealt with these issues in the final rule, responding to similar comments made during the rulemaking process (many of them by plaintiff), noting that analysts are able to work with alternative pest names and that searches often cover full article text or at least abstracts.  69 Fed. Reg. 24,920.  APHIS also notes, "While we do

---

[7] See A.R. at 268 (1998 comment from Fish and Wildlife Service that insufficient biological information exists to fully assess the risk of proposed rule at that time).

not believe there is a shortage of appropriate scientific
information in this specific case, if APHIS were to regulate the
trade of agricultural commodities based on the risk posed by
unknown factors, such an action could be viewed as highly
arbitrary." Id. It would indeed be unlawful for APHIS to shut
the borders without data supporting a reason to do so. After a
review of the record, I find that APHIS performed a reasonable
search of the literature.

Plaintiff next complains about APHIS's reliance on past
inspection records, noting that they would not provide complete
data and might omit many potential risks. Inspection data from
phaleonopsis orchids generally involved bare rooted orchids,
which tend to be transported only as seedlings. Mealybugs are
most frequently subterranean, and thus would not have generally
appeared in these inspections. Second Am. Compl. at 36. Also, a
number of pests, including mites, blossom midges, thrips, and
other "blossom-infesting organisms," attack primarily blossoming
plants, and so would not appear frequently under the prior
regulations. Id. 17, 22. Defendant responds to this complaint
with many points. First, APHIS relied, not exclusively on
inspection data, but also on a literature search; and the initial
list of pests of concern did consider pests associated with a
range of plant parts, including flowers. See A.R. at 1712-17.
Second, at least some flowering plants have long been imported on

tree fern slabs, coconut husks, or coconut fiber, so inspection records would encompass flower-infesting pests.[8]  Third, a mealy bug (Planococcus minor) was among the six pests studied in depth as part of the risk assessment, so APHIS can hardly be said to have completely ignored mealy bugs.  See A.R. at 1719.  Fourth, there is no evidence in the record directly linking any of the pests discussed by plaintiff with phaleonopsis.  Plaintiff has not successfully refuted any of these arguments.

Plaintiff asserts that APHIS ignored data added to the record by the State of Hawaii based on its own border inspections of orchids, including inspections of 50,000 phaleonopsis orchids from a 1993 experimental program.  See Pl.'s Mot. for Summ. J. at 15-16.  Hawaii appears to have detected pests that were not caught by APHIS, and a number of others not initially detected appear to have matured during the state's 60-day quarantine period and were caught later.  Id.; A.R. 1055-56 (listing Hawaiian interceptions following federal inspections).  Defendant responds to this point by noting that many of the pests intercepted by Hawaii either were not associated directly with phaleonopsis or were not quarantine pests.  D.'s Reply 19.  Also,

---

[8] While these imports have long been allowed, it is not clear from the record whether they have been common.  Also, while flowering plants have been permitted as long as they are bare-rooted, plaintiff claims that such imports are rare because repotting such plants causes loss of flowers.  Pl.'s Mot. for Summ. J. at 4.

defendant points out that the imports in 1993 were not
necessarily subject to the same restrictions now imposed by the
plants-in-growing-media rule, and that some of the 1993 pests may
have infested the orchids after their arrival in Hawaii.  Def.'s
Resp. to Statement of Material Facts ¶ 55.  But see A.R. at 89
(detailing rigorous -- although not as rigorous as plants-in-
growing-media rule -- restrictions in place for 1993 study).
APHIS is perhaps too dismissive of Hawaii's inspection data, but
the record does establish that APHIS considered the data.[9]  I
cannot say that its analysis was arbitrary, capricious, or
unlawful.

B. Pests identified only at the species level

APHIS removed 30 pests from the initial list of 62
because the data identified them only at the family or genus
level, and not at the species level, see A.R. at 1712-1718, even
though a number of pests identified only generically have been
directly linked to phaleonopsis orchids, and even though in some
cases full classification is possible only at certain stages of a

---

[9] The record reflects some confusion as to whether APHIS
considered a 20-page list of pests associated with orchids
(including some associated with phaleonopsis specifically --
although none specifically associated with phaleonopsis in
Taiwan) that was compiled by Hawaii's Department of Agriculture
from literature and interception records.  A.R. at 90, 134-53.
The government asserted during oral argument that this list was
indeed considered, but counsel may have been referring to the
five-page list (ending at A.R. at 1717) of 62 pests that APHIS
compiled during its risk assessment.  See 1/6/05 Tr. at 37-38.

pest's lifecycle (e.g., mature adult, but not larval), which may or may not coincide with times of inspection.  A.R. at 1717-18. APHIS has represented that it will take quarantine actions if pests identified only at higher levels are actually intercepted by inspectors.  A.R. at 1717-18.  Further, APHIS's risk evaluations are not static and are subject to reassessment if these winnowed pests do appear during inspections.  Id.  APHIS did cut off consideration of a large number of pests with one broad stroke,[10] but its decision to do so appears to have been a considered one.

### C. Links to phaleonopsis orchids

APHIS winnowed out several pests of concern from further consideration because, while they have been associated with orchids in general (the orchidaceae family), they have not been specifically associated with orchids of the genus phaleonopsis.  See A.R. at 1718.[11]  Plaintiff argues that much of the literature and research in this area is only at the family level, so many pests are improperly excluded by winnowing in this matter.  Defendant asserts that there is no proof that any of the

---

[10] APHIS's alleged "failure" to consider the millions of insects that have not been described by science cannot be a concern of the law.  See Second Am. Compl. at 22-23.  No statute requires that all plant imports to be banned until scientists complete the task of fully describing the natural world.

[11] This appears to be the case for at least several members of the thrips family.  See A.R. at 304, 1714-15, 1718.

pests in question are actually associated with phaleonopsis specifically and that "generally accepted scientific methodology" does not require analysis of pests at the plant family level, providing the example of potatoes and tomatoes, which are both in the same family but have different pest problems.  Def.'s Mot. for Summ. J. at 37-38.  APHIS appears to have reasonably considered this issue, <u>see, e.g.,</u> A.R. at 1718, which is all that a reviewing court can require.

2. Sufficiency of pest mitigation efforts

Plaintiff is critical of APHIS's determination that the mitigation requirements in its plants-in-growing-media rule, taken together, will minimize the risk of importation to a level no higher than it was before the new rule. A.R. at 1727-36.  This criticism focuses on a number of individual mitigation requirements.  There is a basis in the record, however, for APHIS's conclusion that, even if some mitigation efforts are not effective for all pests, the overall mitigation strategy will be effective.  <u>Id.</u>  This reliance on a "systems approach" to pest mitigation is well within the agency's discretion.  In any case:

- Defendant has provided justification for the different treatment of the doors on rhododendron and orchid greenhouses.  <u>See</u> Def.'s Mot. for Summ. J. at 47; A.R. at 1700.

- Defendant is entitled to rely on its experts that spodoptera litura moth eggs will be visible in inspections.  See Marsh, 490 U.S. at 378.

- The bilateral agreement with Taiwan requires copper flashing to protect benches, A.R. at 1550, so any failure to include this in parts of the rule subject to comment is harmless error.  See Advanced Micro Devices v. CAB, 742 F.2d 1520, 1536 (D.C. Cir. 1984).

- A 0.6 mm screen may not be fine enough to exclude all pests from greenhouses, but defendant makes a reasonable argument that the systems approach sufficiently protects against pests and is much cheaper.  See Pl.'s Mot. for Summ. J. at 45.

3. Other issues

Plaintiff also complains: that APHIS incorrectly concluded that the colletotrichum phaleonopsis fungus is not a concern because it is the same thing as the colletotrichum gloeosporidoes fungus, which is already present in the U.S.; that APHIS underestimates the consequences of a fungus outbreak in the U.S.; that thrips will carry viruses into the U.S. that are almost possible to eradicate; that imports will lead to pesticide resistant thrips in the U.S.; and that imports will lead to antibiotic resistant pathogens in the U.S.  These claims are

either insufficiently supported, or they have been met with reasonable responses to which I must defer.

## Plaintiff's National Environmental Policy Act (NEPA) claims

APHIS performed an environmental assessment under NEPA and issued a FONSI, thus terminating the NEPA process. Plaintiff's claim is that the issuance of a FONSI was improper, because the new rule would, in fact, have a significant impact on the human environment by introducing Forcipomyia taiwana, the blood-sucking midge known as "little King Kong" into the U.S. in sphagnum moss.

When evaluating a decision to issue a FONSI against a claim that it was arbitrary and capricious, I must consider

> (1) whether the agency took a "hard look" at the problem;
> (2) whether the agency identified the relevant areas of environmental concern; [and]
> (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant

Sierra Club v. Peterson, 717 F.2d 1409, 1413 (D.C. Cir. 1983). APHIS considered the midge problem in its environmental assessment, noting that several commenters had expressed concern. A.R. at 430.  For a variety of reasons, however, plaintiff cannot prevail on its claim.

The record contains no evidence of any midges on sphagnum moss in greenhouses in Taiwan.[12]  Ferns imported on sphagnum moss from Taiwan in the past had no midge problems. A.R. 430.  See 69 Fed. Reg. 24,930.  After due consideration, APHIS determined that if any midges that did present a problem, Taiwanese pest control measures would be sufficient.  See 69 Fed. Reg. 24,930.  Plaintiff's repeated references to fungus gnats on ferns in the Netherlands, e.g., Pl.'s Mot. for Summ. J. at 34, are not clearly shown to have anything to do with midges on sphagnum moss in Taiwan, nor is the record on this point sufficient to overcome the deference due to defendant's scientific decisions.

Plaintiff goes on to argue that the environmental assessment failed to consider the intensity of the impact of blood-sucking midges in the U.S., as required by 7 C.F.R. § 1508.27(b), which requires assessments of both "the degree to which the proposed action affects public health or safety," Id. § 1508.27(b)(2), and "the degree to which the effects on the quality of the human environment are likely to be highly controversial."  Id. § 1508.27(b)(4).  Plaintiff paints a grim picture of schoolchildren in Taiwan burning wood in cans to ward

---

[12] There were references at oral argument to records of interceptions of midges at Kahlui Airport, 1/6/05 Tr. at 39-40. However, it appears that these records are not part of the administrative record.

off midges in their classrooms, Pl.'s Reply at 16, but this picture has no impact in the absence of evidence that midges would be introduced under the new rule.  See Def.'s Reply at 26-27.  The spectre of public outrage in Hawaii should little King Kong appear there, see Pl.'s Reply at 16, is not the "controversy" to which the regulations refer.  "Controversy" under the regulations means disagreement over the scope of the impact, see Town of Cave Creek, Arizona v. FAA, 325 F.3d 320, 331-32 (D.C. Cir. 2003), which plaintiff does not appear to suggest exists.

Plaintiff argues finally that 0.6 mm screening is not sufficient to keep out midges.  In addition to all of the discussion about a "systems approach" to mitigation, supra, there is much back-and-forth in the briefs on midges and screen size. Apparently the midges cannot fly through 0.6 mm screening (they have a 1.0 mm wingspan and 1.4 mm length), but they might be able to "wriggle" through the mesh (their bodies are .3 or .4 mm in width).  Pl.'s Reply at 13-14.  The record, however, contains no evidence of blood-sucking midge wriggling.

APHIS's discussion of blood-sucking midges in its environmental assessment consisted of a single paragraph and concluded simply, "There is no evidence that these insects infest greenhouse-grown plants or are pests of greenhouses.  Ferns from Taiwan are known to be imported in sphagnum moss, and are

eligible for importation into Hawaii."  A.R. 430.  Plaintiff has done nothing to seriously challenge this conclusion.  Given the degree of deference owed to the defendant, and the lack of any evidence of midges in greenhouses, APHIS's decision to issue a FONSI is not arbitrary or capricious.

* * *

An appropriate order accompanies this memorandum.


JAMES ROBERTSON
United States District Judge